CRARY (CHASE v.). See Case No. 2,626.

---

## Case No. 3,362.

### CRARY v. The EL DORADO.

[24 How. Pr. 128;[1] 35 Hunt, Mer. Mag. 68.]

District Court, S. D. New York. March Term, 1856.

#### SALVAGE—ICE IN HARBOR—ASSISTANCE OF TUG.

1. Meritorious services rendered by a steam-tug in our harbors, in saving a vessel beset with ice, cannot be placed on the basis of salvage services, in their proper acceptation. A branch of the employment of steam-tugs, during the season of ice, is to aid vessels in moving their positions to all parts of the harbor. A steam-tug aiding a vessel thus beset, is not regarded in the character of a volunteer governed by impulses of humanity, leaving her own pursuits, and devoting herself to the rescue of another, with no view to compensation, but upon the final success of her efforts. Her services stand essentially on different grounds: 1. They impose no unauthorized or wrongful risks upon their owners. 2. They may have a reward, whether needed or not, and will not necessarily lose it because the services undertaken by them fail of being accomplished. 3. They differ from salvors, because they pursue and solicit the employment, and hold themselves prepared to fulfill a call to it, whenever made. They act notoriously as tow-vessels; as such, bargains made by them to render, for a compensation, services which otherwise might be salvage services, will be upheld, unless the case is clear that the bargain is a means of coercing an exorbitant price. In such case, the court will not permit the fears or weakness or ignorance of a party to be made the occasion of inequitable exactions from him.

2. In an action brought by the tug against a schooner and her cargo, to whom services of a salvage character were rendered by the tug in saving her from the ice by which she was beset, the court dismissed the libel against the cargo, but decreed against the bottom, with costs, for a reasonable compensation.

This libel was filed by [Humphrey H. Crary and others] the owners of the steam-tug C. P. Smith, to recover a salvage compensation for services rendered to the schooner. The libellants alleged that [on the 4th of February, 1856][2] the schooner, with a cargo of molasses on board, was lying at anchor in the North river, surrounded by heavy ice, by reason of which she was in great danger, and those on board of her hailed the steam-tug, and agreed to give $1,000 to be towed to a place of safety, which the tug succeeded in doing, suffering great damage herself in the service, and they claimed to recover the sum of $1,000. It was proved that the tug had been employed in towing other vessels, which were near the El Dorado, on that morning; that she was engaged in the service only a few hours, and that the captain of the schooner was not on board, but the mate was, who, as the claimants alleged, could not make any binding agreement in the premises; that the customary compensation to tugs for aid of that description was $20 an hour, and no case was shown where more than $350 had been paid.

D. McMahon, for libellants.

E. C. Benedict, for claimants.

BETTS, District Judge. The recovery in this case cannot be justly placed on the basis of salvage services, in their proper acceptation in law, nor on the footing of a specific bargain, by the person in command of the schooner, to pay $1,000 for the towage undertaken to be performed on the part of the libellants. The libellants' tug was employed in the towage business in this harbor, and out to and in return from the sea; and an essential branch of the employment of steam-tugs on those grounds, during the season of ice, is to aid vessels in moving their positions to all parts of the harbor, and from pier to pier along the docks on each face of the city. The customary rate of compensation to these tugs, for aid of that description, is $20 per hour for the time they are engaged with a vessel and in going to her. The remuneration is enhanced in cases of great peril or extraordinary exertions, but no case was proved on the trial in which more than $350 had been received for this class of services rendered within the harbor. Boats are built and equipped for this special business, and kept engaged in it at all periods of the year. The use of this kind of craft has grown to be one of the necessities of commerce and navigation in this port, and the demand for their services has brought into use a numerous flotilla of steam-tugs, who, like the pilots, are always to be had, to give vessels the advantages of their capacities in every season and under every circumstance in which they can be employed. The constancy of the demand guarantees also, in the average, a remunerative reward for the

---

[1] [Reported by Nathan Howard, Jr., Esq.]

[2] [From 35 Hunt, Mer. Mag. 68.]

services they render, if it is not absolutely assured them in each individual case.

It has not as yet been attempted to measure that reward by an absolute scale of charges, it being probably found that the competition in business and the mutual interest of employers and employees will secure to this branch of industry an adequate compensation, and still restrain its exactions within reasonable limits. A change so fundamental in inter-territorial and coast navigation, since the foundation of the principles of maritime jurisprudence, renders those rules defining the relation of helping vessels to those relieved by them in distress, in a great degree, inapplicable. The new condition of things introduced by this modern agency, created for the conveniency and relief of vessels, either found in want of assistance, or in apprehension of needing it, no longer places the relieving vessel in the character of a volunteer, governed by impulses of humanity, leaving her own pursuits, and devoting herself to the rescue of another in peril, with no view to compensation but upon the final success of her efforts, attended with the hazard of sacrificing herself or her voyage in the adventure. The courts apply their powers earnestly to encourage and stimulate salvage services of that grade, by payments for them, not restricted to the amount of benefit actually conferred, but measured also with a view to the meritorious motive of the acts, and considerations of public policy.

Steam-tugs stand essentially on different grounds. They impose no unauthorized or wrongful risks upon their owners. They may have a reward, whether needed or not, and will not necessarily lose it because the service undertaken by them fails being accomplished; and what differs vitally their aid from that of vessels casually coming upon one in distress, is, that the steam-tugs pursue and solicit the employment, or hold themselves prepared to fulfill a call to it whenever made. Those considerations no way detract from their claim to an adequate recompense, nor impair the importance of their services to the interests and safety of navigation; but they demonstrate that the new relationship with other vessels, introduced by the establishment of this class of vessels, no longer entitles them to claim the character of salvors in most instances where it might, by maritime courts, be readily attributed to vessels not devoted to this special pursuit, having become a kind of public calling. They act notoriously as tow vessels. They seek that business, and undertake to assist vessels in that manner. When no other than towage service is performed, there can be no propriety, in respect to that craft, in characterizing and rendering it as a salvage. The courts possess ample authority to adapt the recompense for towage, in extraordinary cases, to their exigencies, or they may, when not restrained by positive law, augment the ordinary amount of pilotage to meet the difficul-

ties and merits of the service, without exalting it to a salvage compensation. Parties, moreover, are free to bargain for themselves, and their agreements will be regarded as fair indicia of what might properly be claimed, when the case is clear of all overreaching or misapprehension, and will, as a common practice, decree in conformity with the agreement. But they will not allow their powers to be used as means of covering the fulfillment of exorbitant or unconscionable bargains, however they may have been obtained. The courts will be governed by the facts in proof, with a disposition always to uphold the agreement of parties, but with inflexible resolution not to permit the fears or weakness or ignorance of a party to be made the occasion of inequitable exactions from him.

I did not go over, on this occasion, the evidence in the cause; but I am satisfied from it, that the demand of $1,000 for the services rendered, whether placed upon the agreement of the master of the schooner or on the worth of the service, is unreasonably beyond what ought to be awarded the tug. When the views of the court are fully expressed, it may be proper to notice the particulars of the transaction, and the reasons conducing to the adoption of the sum now decreed the libellant, differing so widely as it does from what the libellant contends he has proved—a positive contract to pay him, and that which the claimants suppose they establish to be a full recompense for the service. The decree will be, that the libellant recover against the schooner, her tackle, &c., (in this cause,) $350, and his taxed costs. And it is further ordered, that the arrest and attachment of the cargo on board the said schooner be discharged, with costs to the claimants to be taxed against the libellant. Decree accordingly.